# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ISHMAEL A. BURK, | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 23-CV-3004 |
| | : | |
| MS. QUINN, *et al.* | : | |
| *Defendants.* | : | |

## MEMORANDUM

**Pappert, J.**                                                          **February 2, 2024**

Ishmael A. Burk, an inmate confined at SCI Chester, filed this action seeking money damages for alleged violations of his civil rights.  In a prior Memorandum and Order, the Court dismissed all of Burk's official and individual capacity claims against Grievance Coordinator Ms. Quinn and Chief Grievance Officer D. Varner on statutory screening of the Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).  *Burk v. Quinn*, No. 23-3004, 2023 WL 5432504 (E.D. Pa. Aug. 22, 2023).  The Court directed service of Burk's individual capacity First Amendment retaliation claims against Agent Ms. James, Supervisor Ms. James, and Unit Manager Ms. Neally.  *Id.*

Agent Ms. James, identified in the Motion as Carmen James; Supervisor Ms. James, identified as Chandra James; and Unit Manager Ms. Neally, identified as Jaclyn Neally (collectively "the Commonwealth Defendants") move to dismiss Burk's claims. (ECF 12) The Court grants the motion in part.

I[1]

Burk alleges that on an unspecified date Agent James came into Burk's place of work in the jail kitchen, though when Burk was not there, and told Burk's coworkers he had been denied parole. (Compl. at 8.)  Two days later, Agent James called Burk into her office and told him he did not make parole. (*Id.*)  Burk asked her if he could see "physic" and Agent James told him no. (*Id.*)  Agent James allegedly told Burk he did not make parole because he filed a lawsuit against a nurse who was her friend. (*Id.*)

On an unstated date, Burk submitted a grievance along with a request to staff addressed to Supervisor James. (*Id.*)[2]  The following day, Agent James came into the "ODR" – the term is not explained – and "started to antagonize [Burk] telling [him] that she was glad that he did not make parole that on purpose she did not submit [Burk's] certificates so he would not make parole." (*Id.*)  Burk left his work area notifying his instructor that he could not continue to work. (*Id.*)

Burk submitted another grievance on an unstated date, and the next day Jaclyn Neally called him into her office and allegedly pressured Burk to withdraw it, telling him it would not end well for him. (*Id.* at 8-9.)  Burk had told his mother about what happened and his mother called the prison and spoke with Agent James and Supervisor James. (*Id.* at 9.)  The next day, Burk was notified by his kitchen supervisor that he could no longer work in the kitchen because Agent James and Supervisor James got him fired due to the call from Burk's mother. (*Id.*)  Agent James allegedly had someone

---

[1] The facts set forth in this section of the Memorandum are taken from Burk's Complaint (ECF No. 2).  The Court adopts the pagination assigned by the CM/ECF docketing system to the Complaint and other cited pleadings.

[2] Because there are two Defendants with the last name of James, the Court will refer to them as "Agent James" and "Supervisor James."

from security threaten Burk not to move forward with his lawsuit against the nurse "stating he would receive a hit from Parole." (*Id*.)  Burk filed another grievance on an unstated date, but Neally investigated "only the first half of [Burk's] grievance but did not follow up on the second half." (*Id*.)  Burk alleges that Agent James has not submitted Burk's parole package and both Agent James and Supervisor James have stopped him from getting another job within the jail. (*Id*. at 10.)

II

In their Motion, the Commonwealth Defendants argue Burk failed to properly exhaust his claims as required by the Prison Litigation Reform Act, and that he fails to allege claims upon which relief may be granted.[3]  They assert that Burk filed seven relevant Grievances Numbered 1027594, 1027592, 103551, 103552, 103352, 1034653, and 1031947.  While the Commonwealth Defendants concede that Burk did exhaust Grievance 1034967 ("the '967 Grievance"), concerning a portion of the events described in the Complaint, they argue that he failed to appeal the denials of the other grievances through the highest level of the process with all proper documentation, and they were subsequently dismissed by prison officials for that reason. (Def. Mot. (ECF No. 12) at 12.)  They argue that Burk's failure to comply with the requirements of the prison grievance system with regard to those grievances precludes him from asserting his claim in this Court based on the events at issue in those grievances. (*Id*.)  The

---

[3] The Commonwealth Defendants also argue that the Eleventh Amendment bars Burk's official capacity claims, and the Commonwealth Defendants are not persons subject to suit for damages under § 1983 in their official capacities. (Def. Mot. at 7-9.)  The Court already dismissed the official capacity claims upon statutory screening of Burk's Complaint. *Burk*, 2023 WL 5432504, at *2.  Accordingly, they were no longer in the case when the Commonwealth Defendants filed their Motion.

Commonwealth Defendants also argue that the claims that were exhausted via the '967 Grievance should be dismissed because the '967 Grievance asserted only that Agent James had Burk demoted, rather than fired from his prison job, because of the call from Burk's mother.  They assert that Burk did not mention Supervisor James or Jaclyn Neally in the '967 Grievance.

Attached to the Motion are the grievances Burk filed about the claims asserted in his case.[4]  In Grievance #1027592, he asserted that on March 31, 2023 – the same day he filed the grievance, Agent James came to the ODR, and mocked him by telling him in front of other inmates and staff that he "got a year hit" – *i.e.* that his parole was denied – and that she retaliated against him for filing a lawsuit.  (ECF No. 12-1 at 2-4; Response, (ECF No. 16) at 14, 16.)[5]  Grievance #1027594, which Burk also filed on March 31, 2023, asserts that Agent James failed to submit the needed program completion certificates for Burk's parole review.[6]  (*See* ECF No. 12-2 at 2; ECF No. 16 at 30.)  Burk complained that she did not do her job properly because she only submitted one-half of the material that he had given to her, and left him "out in the cold."  (*Id.*)

---

[4] Burk attached identical copies of many of the same grievances to his Response. The Court finds they are undisputedly authentic documents upon which Burk's claims are based and are properly considered in adjudicating the Commonwealth Defendants' Motion. *See Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (stating a court may consider undisputedly authentic documents if the plaintiff's claims are based upon those documents).

[5] The copies of Burk's grievance are not entirely legible.

[6] While not a grievance document, the Commonwealth Defendants also attached to their Motion a copy of a Request to Staff Member that Burk filed on April 5, 2023, addressed to Agent James, in which he requested a new parole agent, made the same allegation about her telling other staff and inmates about his parole hit, and claimed her actions aggravated his depression.  (ECF No. 12-2 at 9.)  James offered to make a referral to psychology on his behalf to assist with his depression.  (*Id.*)

4

He also repeated the allegation that she had told others that he received a parole hit. (*Id.*)  In neither the '592 Grievance nor the '594 Grievance did Burk ask for monetary relief.

The '592 Grievance and the '594 Grievance were denied on initial review by Neally after she allegedly investigated the claim by speaking with Ms. Gray from Culinary, the staff member present in the ODR, who denied hearing Agent James say anything about the parole hit, and because Burk did not provide any evidence to support his claims.  (ECF No. 12-1 at 3, ECF No. 12-2 at 4; ECF No. 16 at 15, 31.)  Burk appealed the denials to the Superintendent of SCI Chester, asserting that his claim was not properly investigated and that he was fired from his prison job.  (ECF No. 12-1 at 4, ECF No. 12-2 at 5; ECF No. 16 at 16, 32.)  Superintendent Gina Clark denied the appeals stating that she investigated the grievance, that the staff involved denied Burk's allegations, that his allegation that Agent James had him fired from his job was meritless, and that Burk did not provide evidence to support his claims.[7]  (ECF No. 12-1 at 5, ECF No. 12-2 at 6; ECF No. 16 at 17, 33.)  Burk's final appeals of the two grievances to the DOC's Chief Grievance Officer were denied on the ground that Burk failed to provide legible copies of his initial grievance forms.  (ECF No. 12-1 at 1, ECF No. 12-2 at 1; ECF No. 16 at 18, 35.)

---

[7] Clark noted that Burk provided an anonymous statement from another inmate with his appeal, but that the statement was not evidence that supported his claims.  (ECF No. 12-1 at 5, ECF No. 12-2 at 6; ECF No. 16 at 17, 33.)  In the statement, the inmate asserted that on March 10, 2023 he was approached by an inmate named Thomas who asked him if Burk got a hit.  (ECF No. 12-2 at 3.)  The inmate told Thomas that he did not know if he did or did not get a hit, and Thomas stated "well Agent James told him and Kitchen Instructor Ms. Gray that [Burk] received a year hit from the Parole Board."  (*Id.*)

In Grievance #1031947, filed on April 27, 2023, Burk asserted that Agent James had him demoted from his prison job. (ECF No. 12-3 at 2.) He also asserted that Supervisor James had him demoted from his job in the ODR on April 26, 2023 because Burk's mother had contacted her. (*Id*.[8]) He claimed to have had nothing to do with his mother's actions. He also stated that he had a pending grievance against Agent James regarding her handling of his "green sheet," apparently a reference to his parole certifications. (*Id*.) He repeated his assertion that Agent James told others about his parole hit before she informed Burk and claimed that she and Supervisor James acted in retaliation for his pending lawsuit. (*Id*.) Because he was demoted, his pay rate was affected. (*Id*. at 3.) He asked for money damages of $200,000 due to the anxiety he experienced. (*Id*.) The '947 Grievance was rejected by the facility grievance coordinator on May 3, 2023, because the issues presented were also presented in the '594 Grievance. (*Id*. at 1.)

Burk submitted Grievance #1033552 on May 12, 2023 asserting that Agent James had him demoted from his job in the ODR, causing him to be unemployed and be demoted. He sought $100,000 for depression and anxiety. (ECF No. 12-4 at 2.[9]) The '552 Grievance was rejected by the facility grievance coordinator on May 15, 2023, because it was not submitted within fifteen working days after the events upon which the claims were based. (*Id*. at 1.)

Burk submitted Grievance #1033551 on May 15, 2023 asserting that Agent James had him fired from the ODR and demoted and he did not know why. He asked

---

[8] Burk did not attach a copy of the '947 Grievance to his Response.

[9] Burk did not attach a copy of the '552 Grievance to his Response.

for $70,000 in damages for back pay.  (ECF No. 12-5 at 2; ECF No. 16 at 8.)  The '551 Grievance was denied on May 15, 2023 by the facility grievance coordinator because Burk failed to comply with a DOC requirement since he included different events in one grievance.  (ECF No. 12-5 at 3; ECF No. 16 at 9 (stating "Grievances based upon different events must be presented separately.").)  Burk appealed the denial to the Superintendent stating he presented only one issue because his firing and demotion happened on the same day and the "events were the same."  (ECF No. 12-5 at 4; ECF No. 16 at 10.)  The appeal was denied on May 20, 2023.  (ECF No. 12-5 at 5; ECF No. 16 at 11.)  Burk's final appeal to the DOC was denied on July 18, 2023 on the ground that Burk failed to provide a legible copy of his grievance form.  (ECF No. 12-5 at 1; ECF No. 16 at 13.)

Burk submitted Grievance #1034653 on May 5, 2023 asserting that Neally did not properly investigate his '592 Grievance since she never spoke with Agent James and did not look into why he was demoted.  (ECF No. 12-6 at 2; ECF No. 16 at 20.)  Burk did not ask for monetary relief in the '653 Grievance.  The '653 Grievance was rejected by the facility grievance coordinator on May 22, 2023 because the issue Burk raised had been reviewed in the '592 Grievance.  (ECF No. 12-6 at 3; ECF No. 16 at 19.)  Burk appealed the denial, arguing that the issue of whether the '592 Grievance was properly investigated was not addressed in the '592 Grievance.  (ECF No. 12-6 at 4; ECF No. 16 at 21.)  The Superintendent denied the '653 Grievance on June 5, 2023 stating she concurred with the initial rejection.  (ECF No. 12-6 at 5; ECF No. 16 at 22.)  Burk's final appeal to the DOC was denied on July 24, 2023 on the ground that Burk

failed to provide a legible copy of his grievance form. (ECF No. 12-6 at 1; ECF No. 16 at
23.)

      Burk submitted the '967 Grievance on May 23, 2023 asserting that he learned on
May 13, 2023 that Supervisor James removed him from his job in the ODR due to the
phone call from his mother. (ECF No. 12-7 at 2; ECF No. 16 at 24.) He claimed this
was his only source of income and that he could no longer buy items he needed. (*Id.*)
He sought $70,000 for pain and suffering and $20,000 for lost wages. (*Id.*) The '967
Grievance was denied on May 30, 2023 on the ground that Burk "signed out of the
kitchen" on May 1, 2023, he was not fired from his job, and "Ms. James" did not get him
fired. (ECF No. 12-7 at 3; ECF No. 16 at 25.) Burk appealed the denial asserting that
Agent James — as opposed to Supervisor James, who was identified in the initial
grievance — got him demoted and he "was directed to work line 2," causing him to lose
wages. (ECF No. 12-7 at 4; ECF No. 16 at 26.) He also stated that Agent James "got
me fired and she is "taking it out" on Burk because of his mother's actions. (*Id.*) The
Superintendent upheld the denial of the '967 Grievance on June 6, 2023, stating that
she investigated his claim and found that Burk had signed out of the kitchen on May 1,
the sign out form was in his employment file, he was not fired, and Agent James did not
get him fired.[10] (ECF No. 12-7 at 5; ECF No. 16 at 27.) Burk then filed a final appeal
in which he asserted that Agent James had him fired because she had words with his
mother over the phone over how Agent James handled his parole paperwork. (ECF No.
12-7 at 6; ECF No. 16 at 28.) He claimed that Agent James contacted the kitchen

---

[10] While Burk argued in his appeals of the '967 grievance that Agent James got him
fired, his grievance initially asserted that Supervisor James got him fired. The appellate
reviewers, however, focused on the allegation concerning Agent James.

supervisor to have him removed from his job.  (*Id.*)  The DOC's chief grievance officer rejected Burk's final appeal because the record reflected that an investigation into his claim as to Agent James showed that the claim was unfounded, his sign out form was in his employment file, no evidence was found to support his claims, and no evidence of wrongdoing was identified.  (ECF No. 12-7 at 1; ECF No. 16 at 29.)

III

In his Response, Burk argues that he exhausted all his available remedies. (ECF No. 16 at 2.)  He notes he submitted multiple grievances and asserts he exhausted those numbered '592, '653, '967, '594, and '551.  (*Id.*)  He repeats his allegation that he was subjected to retaliation by Supervisor James and Agent James due to the call from his mother, and that his First Amendment rights were violated when he lost his job and when they interfered with his parole.  (*Id.* at 3-4, 5.)  He also repeats his allegation that Neally pressured him to withdraw his grievances.  (*Id.* at 5.)

Burk attached to his Response a Declaration by fellow inmate Caleb Hollenbach, in which he asserts that Burk told him that Agent James told staff members and another inmate about his parole hit, and that Burk lost his job.[11]  (ECF No. 16 at 37.) Hollenbach states that he has also had issues with Agent James about his own parole. (*Id.*)  A signed Declaration by fellow inmate George Pickett asserts that Agent James told inmate Anthony Thomas that Burk received a year hit from the parole board, and that she also told this to the kitchen instructor.  (*Id.* at 38.)  A signed Declaration by Burk's mother, Sandra Burk, asserts that she called Agent James after Burk was

---

[11] Hollenbach's one-page declaration is unsigned.  It appears there may have been additional pages since the one page Burk submitted ends in an incomplete sentence.

denied parole because James had been telling others about the development.  (*Id*. at 40.)  She states that they "had words" about Agent James's acting unprofessionally. (*Id*.)  Burk was then allegedly fired from his job in the ODR, filed a grievance, and Neally pressured him into withdrawing it.  (*Id*. at 41.)

IV

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the sufficiency of the pleadings.  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id*. (citing *Twombly*, 550 U.S. at 555.)  "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("The pleading standard 'is not akin to a 'probability requirement'"' rather, "to survive a motion to dismiss, a complaint merely has to state a 'plausible claim for relief.'" (quoting *Iqbal*, 556 U.S. at 678-79)).  In other words, "there must be some showing sufficient to justify moving the

case beyond the pleadings to the next stage of litigation." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234-35 (3d Cir. 2008).

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  The Court may consider the Complaint, the exhibits attached to the Complaint, matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon those documents.[12]  *Mayer*, 605 F.3d at 230.  Courts must "accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff, and ultimately determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint." *Id.*, at 229.  Furthermore, "[o]n a motion to dismiss, the district court must read a *pro se* plaintiff's allegations liberally and apply a less stringent standard to the pleadings of a *pro se* plaintiff than to a Complaint drafted by counsel." *Perlberger v. Caplan & Luber, LLP*, 152 F. Supp. 2d 650, 653 (E.D. Pa. 2001) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)).  "Yet even in the case of pro se litigants this leniency does not give a court license to serve as a de facto counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action." *Pricharda v. Street*, No. 22-3061, 2022 WL 4856225, at *2 (E.D. Pa. Oct. 3, 2022) (citing *Campbell v. Air Jamaica Ltd.*, 760 F.3d 1165, 1168-69 (11th Cir. 2014)).

---

[12] Rule 12(d) requires that if, on a motion under Rules 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  Fed. R. Civ. P. 12(d).  The material that Burk attached to his Response, apart from materials related to the grievance process, is not relevant to the exhaustion issues raised by the Commonwealth Defendants and is excluded from the Court's consideration of the Motion.  The materials related to exhaustion, however, may be considered at this stage as explained further below.

V

A

"In an effort to curb the number of prisoner filings in the federal courts, Congress enacted the PLRA which[] . . . mandates that prisoners exhaust internal prison grievance procedures before filing suit." *Small v. Camden Cnty.*, 728 F.3d 265, 268 (3d Cir. 2013); *see* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) ("[E]xhaustion of available administrative remedies is required for any suit challenging prison conditions, not just for suits under § 1983.") (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)). "Exhaustion is . . . a non-jurisdictional prerequisite to an inmate bringing suit and, for that reason, . . . it constitutes a threshold issue that *courts* must address to determine whether litigation is being conducted in the right forum at the right time." *Rinaldi v. United States*, 904 F.3d 257, 265 (3d Cir. 2018) (emphasis in original, internal quotations omitted); *Small*, 728 F.3d at 269 ("[E]xhaustion is a question of law to be determined by a judge, even if that determination requires the resolution of disputed facts." (footnote omitted)). Accordingly, in cases governed by the PLRA, courts must address whether the prisoner-plaintiff has substantially complied with the prison's specific grievance procedures and determine whether those procedures were "available" to the inmate. *Rinaldi*, 904 F.3d at 265; *Nyhuis v. Reno*, 204 F.3d 65, 77-78 (3d Cir. 2000) ("[C]ompliance with the administrative remedy scheme will be satisfactory if it is substantial.").

12

Under the PLRA, prisoners who seek to challenge their conditions of confinement must exhaust all available administrative remedies.  42 U.S.C. § 1997e(a).  However, "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  *Jones v. Bock*, 549 U.S. 199, 218 (2007).  Accordingly, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules."  *Woodford,* 548 U.S. at 90; *Byrd v. Shannon*, 715 F.3d 117, 127 (3d Cir. 2013) (concluding that prisoner failed to exhaust when he did not name defendant in his grievance as required by the prison grievance procedure); *Brown v. Smith*, No. 18-193, 2021 WL 4429847, at *8 (W.D. Pa. Sept. 27, 2021), *aff'd on other grounds*, No. 21-3127, 2022 WL 2383609 (3d Cir. July 1, 2022) (collecting cases and holding that, because ADM 804 § 2.B.1.j.1 requires that an appeal include a "legible copy of the Initial Grievance," "courts have held that including illegible documents violates the rule and constitutes a procedural default." (citations omitted)).  "Exhaustion merely requires inmates to provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures."  *Mack*, 839 F.3d at 296 (internal quotations and alteration omitted).  Claims that are not properly exhausted under the PLRA are procedurally defaulted.  *See Woodford*, 548 U.S. at 92-93; *Spruill v. Gillis*, 372 F.3d 218, 230 (3d Cir. 2004).

The Pennsylvania Department of Corrections' s general grievance process is set forth in policy number DC-ADM 804, which is available at https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/804%20Inmate%20Grievances.pdf (last viewed Jan. 31, 2024).  *See generally Moore v. Lamas*, No. 22-1007, 2023 WL 371397, at *2 (3d Cir. Jan. 24, 2023) ("DC-ADM 804 provides a general,

though rigorous, mechanism for inmate grievances."). Among other requirements, the

grievance must be signed, dated, legible, understandable, and presented in a courteous

manner. DC-ADM 804, §§ 1.A.10, 11. The United States Court of Appeals for the Third

Circuit has stated that:

> ADM 804 creates the three-step Inmate Grievance System. First, an
> inmate must submit a grievance to the Facility Grievance Coordinator.
> The grievance must include the relevant facts, individuals involved,
> claims alleged, and relief sought. A different official—the Grievance
> Officer—reviews the grievance and submits an initial response. The
> inmate may appeal the initial response to the Facility Manager, who
> reviews it and issues a decision. The inmate may file a final appeal to the
> Secretary of Corrections' Office of Inmate Grievances and Appeals. . . .
> ADM 804 requires an inmate to specify in his grievance any alleged
> violation of department regulations or other law as well as specify the
> compensation or legal relief the inmate desires.

*Prater v. Dep't of Corr.*, 76 F.4th 184, 203-04 (3d Cir. 2023). ADM 804 "is the exclusive

means of exhaustion," so failure to "follow the full administrative review process under

ADM 804" results in a failure to exhaust under the PLRA. *Id.* at 204.

1

Although Burk asserts that he exhausted his claims, the only grievance that

Burk successfully exhausted under ADM 804 is the '967 Grievance. The '592, '594, '551,

and '653 Grievances were not exhausted because Burk failed to provide the DOC's Chief

Grievance Officer legible copies of his initial grievance forms. (ECF No. 12-1 at 1 ('592

Grievance), ECF No. 12-2 at 1 ('594 Grievance), ECF No. 12-5 at 1 ('551 Grievance),

ECF No. 12-6 at 1 ('653 Grievance). The failure to provide legible copies of the initial

grievance when filing an appeal violates ADM 804 and constitutes a procedural default

of the exhaustion requirement. *See Brown*, 2021 WL 4429847, at *8 (holding that

because ADM 804 § 2.B.1.j.1 requires that an appeal include a "legible copy of the

Initial Grievance," and that "courts have held that including illegible documents

violates the rule and constitutes a procedural default").  The '947 and '552 Grievances

were not exhausted because Burk failed to appeal the initial denial of those grievances

to the Facility Manager.[13]  *Prater*, 76 F.4th at 203-04 (failure to follow each step in the

grievance process results in a failure to exhaust).

2

Burk asserted in the '967 Grievance filed on May 23, 2023 that he was entitled to

money damages for pain and suffering as well as lost wages because *Supervisor James*

removed him from his job in the ODR due to the phone call from Burk's mother.  (ECF

No. 12-7 at 2; ECF No. 16 at 24.)  Burk's recitation of the claim in his appeal of the

initial denial was, however, different.  After the '967 Grievance was denied initially,

Burk claimed that *Agent James* got him demoted and fired because of his mother's

actions.  (ECF No. 12-7 at 4; ECF No. 16 at 26.)  Then, on final appeal to the DOC's

chief grievance officer, Burk again only asserted that *Agent James* got him demoted and

then fired because she had words with his mother over the phone about how Agent

James handled his parole paperwork.  (ECF No. 12-7 at 6; ECF No. 16 at 28.)  The

DOC's chief grievance officer rejected Burk's final appeal because the record reflected

that an investigation into his claim that Agent James had him removed from his job

and fired showed that the claim was unfounded, because his sign out form was in his

employment file, no evidence was found to support his claims, and no evidence of

wrongdoing was identified.  (ECF No. 12-7 at 1; ECF No. 16 at 29.)

---

[13] Tellingly, Burk did not attach the '947 or '552 Grievances or any other material to
his Response to rebut the Commonwealth's argument that he failed to exhaust these
grievances.

Thus, only the claim that Agent James had Burk removed from his job and fired from the ODR based on the call from his mother was exhausted since only she was mentioned in Burk's final appeal to the Office of Inmate Grievances and Appeals and only the claim against her was finally determined on the merits. To the extent Burk asserts claims in this case against Supervisor James and Jaclyn Neally, Burk did not exhaust any claim against them (he did not even mention the actions of Jaclyn Neally in the '967 Grievance or in any appeal thereafter). He has thus *a fortiori* failed to exhaust a claim against them regarding his demotion or firing in retaliation for his mother contacting prison officials. Further, because the ADM 804 grievance process was available to Burk, and prison officials followed the process, the unexhausted claims against Supervisor James and Jaclyn Neally are procedurally defaulted and, accordingly, will be dismissed. *See Woodford*, 548 U.S. at 92-93 (claims that are not properly exhausted under the PLRA are procedurally defaulted); *see also Shifflett*, 934 F.3d at 364 ("Exhaustion is considered separately for each claim brought by an inmate, and if a complaint includes both exhausted and unexhausted claims, courts will dismiss the latter but not the former.").

B

Since only the claim that Agent James had Burk demoted and fired from the ODR, has been exhausted, the Court will focus solely on whether this allegation in the Complaint states a claim upon which relief may be granted. In the Complaint, Burk alleges that was notified by his kitchen supervisor that he could no longer work in the kitchen because Agent James and Supervisor James had him fired due to the call from Burk's mother. (Compl. at 9.) On screening the Complaint, the Court understood Burk

16

to be asserting a First Amendment retaliation claim.  *Burk*, 2023 WL 5432504, at *3.
The Commonwealth Defendants argue that this claim, as well as a possible claim under
the Eighth Amendment based on the loss of Burk's prison employment, are not
plausible.  (Def. Mot. at 13-14.)

1

An Eighth Amendment claim based on the loss of Burk's prison employment is
not plausible.  The Eighth Amendment imposes upon prison officials a duty to provide
"humane conditions of confinement."  *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249,
256 (3d Cir.2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  "For an alleged
deprivation to rise to the level of an Eighth Amendment violation, it must result in the
denial of the minimal civilized measure of life's necessities."  *Id.* (internal quotations
and citations omitted).  Such a denial involves "the deprivation of a single identifiable
human need such as food, warmth, or exercise. . . ."  *Wilson v. Seiter*, 501 U.S. 294, 304
(1991).  As the Third Circuit has held that a prison job is not one of life's necessities, *see*
*Watson v. Sec'y Pennsylvania Dep't of Corr.*, 567 F. App'x 75, 78 (3d Cir. 2014), Burk
cannot state a plausible Eighth Amendment claim based on the loss of his prison job.
*Accord, Paulson v. Burke*, No. 20-3678, 2020 WL 5407892, at *4 (E.D. Pa. Sept. 9, 2020)
("Paulson, however, cannot state a constitutional claim based on the loss of his work
assignment because inmates do not have a constitutional right to employment during
incarceration.").

2

In order to state a plausible First Amendment retaliation claim, a prisoner must
allege that:  (1) he engaged in constitutionally protected conduct; (2) he suffered an

17

adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the constitutionally protected conduct was "a substantial or motivating factor" for the adverse action.  *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001); *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003); *Coit v. Garman*, 812 F. App'x 83, 86 (3d Cir. 2020) (*per curiam*).  The Commonwealth Defendants raise no argument regarding the second and third elements of a retaliation claim.  They argue only that Burk's allegations fail to state a retaliation claim because he failed to allege that *he* engaged in protected conduct; rather he alleges only that his mother engaged in protected conduct by contacting Agent James to complain about Burk being fired and the "wording of the elements clearly prohibits only retaliation against the actual person who engaged in protected activity."  (Def. Mot. at 13 (citing *Fogelman v. Mercy Hosp., Inc.*, 283 F.3d 561, 564 (3d Cir. 2002))).  This is incorrect.

First, the citation to *Fogelman* is inapposite.  That case dealt with retaliation in an employment context, not a constitutional context, and was construing specific statutory provisions.  *See Fogelman*, 283 F.3d at 564 (construing the anti-retaliation provisions of the Americans with Disabilities Act).  Moreover, *contra* to the Commonwealth's assertion, the *Fogelman* court held that a third party retaliation claim was proper in that context.  *Id*. ("Greg's claim [under the ADA] that he was retaliated against for his father's protected activity is valid as a matter of law, and we will therefore reverse the grant of summary judgment.").

Second, courts have recognized that a First Amendment retaliation claim may be stated based on the protected conduct of a third party that results in governmental retaliation against the plaintiff.  As a general rule, litigants may not assert the rights of

others to obtain relief from injury for themselves.  *See Singleton v. Wulff*, 428 U.S. 106, 113-14 (1976); *Amato v. Wilentz*, 952 F.2d 742, 748-49 (3d Cir. 1991).  There is an exception to this general rule, however, when (1) the third party's enjoyment of the right in question is "inextricably bound up with the activity the litigant wishes to pursue," and (2) the third party is unable to assert his or her own right.  *Singleton*, 428 U.S. at 113-14.  In such cases, the court must consider three factors.  First, "the court must examine the relationship between the plaintiff and the third party whose rights are asserted."  *Ballas v. City of Reading*, 153 F. Supp. 2d 691, 695 (E.D. Pa. 2001) (citing *Alexander v. Whitman*, 114 F.3d 1392, 1408-9 (3d Cir. 1997).  Second, "the court must consider the ability of the third party to advance its own rights, that is whether some obstacle impedes the rightholder's own suit."  *Id.*  Third, "the court must inquire into the impact on the third party's interests, i.e. whether the plaintiff and the third party have consistent interests."  *Id.*  "In cases asserting discrimination for protected speech, the court should also consider the potential effect of chilling expression."  *Id*. (citing *Amato*, 952 F.2d at 750).

Ballas claimed that she was discharged from her public employment in retaliation for her and husband, Lessig's, support for a comprehensive trash collection policy.  Defendants sought summary judgment on the First Amendment retaliation claim arguing that the record lacked evidence demonstrating that Ballas herself engaged in protected conduct or speech.  *Id*. at 695.  The court concluded:

> Ballas may assert Lessig's speech as a basis for her suit.  As husband and wife, Lessig and Ballas are closely connected. . . .  Lessig is unable to advance his own rights here since the Court has already determined that Lessig could not assert a First Amendment claim because he lacked constitutional injury. . . .  Lessig's enjoyment of the right to speak out on his political beliefs is entwined with Ballas' interest in continued

> employment with the City of Reading because they are financially
> dependent upon each other.  A determination that Ballas lacks standing
> to sue would have the effect of chilling free expression of spouses or
> relatives of state or municipal workers.  All of these considerations
> support a conclusion that Ballas may assert Lessig's speech as a basis for
> her retaliatory termination claim.

*Id*. at 695-96 (footnotes and internal citations omitted).

Similarly analogous to Burk's reliance on his mother's protected conduct to allege a plausible First Amendment claim is *Serena H. v. Kovarie*, 209 F. Supp. 2d 453 (E.D. Pa. 2002).  There the court denied a motion to dismiss where the parties agreed that the speech at issue in the claim was not uttered by plaintiff, but was instead spoken by her mother.  *Id.* at 458.  The plaintiff, a non-verbal infant, brought the claim based on her mother's speech where *she* was the person retaliated against based upon her mother's exercise of free speech.  The court held that the doctrine of third-party standing permitted the plaintiff to assert the rights of her mother to obtain relief for injuries to herself in limited circumstances.  *Id.* (citing *Singleton*, 428 U.S. at 113-14; *Amato*, 952 F.2d at 748-49).  As the allegations of the complaint, viewed in the light most favorable to the infant plaintiff, suggested that she could satisfy the requirements of third-party standing, the court denied the motion to dismiss.

Burk's allegation that he suffered retaliation due to his mother's protected speech asserts a plausible claim against Agent James.  The relationship between Burk and his mother is similarly close to those of the spouses in *Ballas* and is the same as the mother and daughter in *Serena H.*  Like the husband in *Ballas*, Burk's mother cannot assert a First Amendment retaliation claim directly since she suffered no constitutional injury as a result of Burk being fired.  Finally, Burk and his mother share consistent interests in his fair treatment while incarcerated and the potential

20

effect of chilling the mother's expression is an interest protected by the First Amendment.

IV

For the foregoing reasons, the Court will grant the Commonwealth's Motion to the extent it seeks dismissal of all remaining claims in this case other than Burk's First Amendment retaliation claim against Defendant Agent James.  An appropriate Order follows.

**BY THE COURT:**


**_/s/ Gerald J. Pappert_**
**GERALD J. PAPPERT, J.**